IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., as Broadcast Licensee of the December 8, 2007 "Undefeated"; Mayweather/Hatton Event, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:10-cv-02489-K |
| 1) MANDELL FAMILY VENTURES, LLC, Individually and d/b/a GREENVILLE AVENUE PIZZA COMPANY; and 2) SAMUEL J. MANDELL, III, Individually and d/b/a GREENVILLE AVENUE PIZZA COMPANY, | § § § § § § § § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND BRIEF**

William J. Dunleavy
Texas Bar No. 00787404
Law Offices of William J. Dunleavy, P.C.
8140 Walnut Hill Lane
One Glen Lakes, Suite 950
Dallas, Texas 75231
Telephone No. 972/247-9200
Facsimile No. 972/247-9201

Attorney for Defendants

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Defendants' Objections to Plaintiff's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Plaintiff's Claims of Alleged Cable Piracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Claims Under 47 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        Specifically Authorized by Cable Operator . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Plaintiff's Claims Under 47 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Strict Liability Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Plaintiff Lacks Standing to Pursue its Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Plaintiff's Claims are Barred by Collateral Estoppel . . . . . . . . . . . . . . . . . . . . . . 20

    Plaintiff's Claims are Barred by Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# INDEX OF AUTHORITIES

**Cases:**

*Agency Holding Corp. v. Malley-Duff & Associates,*
    483 U.S. 143, 107 S.Ct. 2759 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cablevision of Michigan, Inc. v. Sports Palace, Inc.*, 27 F.3d 566 (6th Cir. 1994) . . . . . . . . . . 16

*DirecTV, Inc. v. Webb,* 545 F.3d 837 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Don King Productions/KingVision v. Lovato,*
    1996 U.S. Dist. Lexis 17632 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Garden City Boxing Club, Inc. v. Vinson*, 2003 U.S. Dist. Lexis 26180
    (N.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
    545 U.S. 409, 125 S.Ct. 2444 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . 21

*J&J Sports Productions, Inc. v. JWJ Management, Inc.,*
    324 S.W.3d 823 (Tex.App.–Fort Worth 2010, no pet.) . . . . . . . . . . . . . . . . . . . . 23, 24, 25

*J&J Sports Productions, Inc. v. Q Café, Inc.,*
    2012 U.S. Dist. Lexis 8700 (N.D. Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*J&J Sports Productions, Inc. v. Schmalz*, Civil Action C-1-09-305 (S.D. Ohio 2010) . . . . *passim*

*Joe Hand Promotions, Inc. v. Lee*, 2012 U.S. Dist. Lexis 73094 (S.D. Tex. 2012) . . . . . . . . . . 12

*Joe Hand Promotions, Inc. v. Macias*, 2012 U.S. Dist. Lexis 36413 (S.D. Tex. 2012) . . . . . . . 12

*Kingvision Pay-Per-View, Corp. v. 898 Belmont, Inc.*, 366 F.3d 217 (3rd Cir. 2004) . . . . . . . 24

*KingVision Pay-Per-View, Ltd. v. Lake Alice Bar*, 168 F.3d 347 (9th Cir. 1999) . . . . . . . . . . . 12

*KingVision Pay-Per-View, Ltd. v. Williams*, 1 F. Supp. 2d 1481 (S.D. Ga. 1998) . . . . . . . . . . . 12

*Prostar v. Massachi*, 239 F.3d 669, 677-78 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Cases (cont.):**

*Stovall v. Price Waterhouse Co.*, 652 F.2d 537 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 995 (D. Md. 1993) . . . . . . . . . . . . . . . 12

*Top Rank v. Gutierrez*, 236 F. Supp. 2d 637 (W.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wehling v. Columbia Broadcasting System*,721 F.2d 506 (5th Cir. 1983) . . . . . . . . . . . . . . . . . 21

*Willis v. Fournier*, 537 F.2d 1142 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Statutes, Codes and Rules**

47 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

47 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

FED. R. EVID 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., as Broadcast Licensee of the December 8, 2007 "Undefeated"; Mayweather/Hatton Event, | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | CIVIL ACTION NO. 3:10-cv-02489-K |
| 1) MANDELL FAMILY VENTURES, LLC, Individually and d/b/a GREENVILLE AVENUE PIZZA COMPANY; and 2) SAMUEL J. MANDELL, III, Individually and d/b/a GREENVILLE AVENUE PIZZA COMPANY, | § § § § § § § § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS FOR SUMMARY
JUDGMENT AND BRIEF**

Defendants Mandell Family Ventures, LLC and Samuel J. Mandell, III ("Defendants") file

this Response to Plaintiff's Motion for Summary Judgment and Brief in Support and show:

**Introduction**

Plaintiff J&J Sports Productions, Inc. ("J&J Sports") is not entitled to summary judgment

on its claims under the Federal Communications Act (FCA). J&J Sports argues that Defendants

violated 47 U.S.C. § 553 and 47 U.S.C. § 605 by allegedly intercepting a closed circuit broadcast

of a boxing match on December 8, 2007. But J&J Sports fails to establish its claims as a matter of

law and its motion for summary judgment should be denied.

Necessary to the Court's analysis of the motion and the Plaintiff's allegations is a recognition

that 47 U.S.C. § 553 and 47 U.S.C. § 605 are statutes designed to combat a problem Congress said

was "increasingly plaguing the cable industry – the theft of cable service."[1] 47 U.S.C. § 553 and 47 U.S.C. § 605 provide no protection for copyrights, trademarks or any other intellectual property right.[2] And J&J Sports did not allege copyright infringement, violation of any trademark, nor does J&J Sports allege theft or conversion of intellectual property rights.[3] But J&J Sports asks this Court to impose liability for what its representative claimed was "theft of intellectual property".[4] Because no intellectual property claim, no conversion claim and no other type of theft claim are asserted, Defendants asks the Court to focus only on the elements of the applicable statutes.

The undisputed evidence shows Defendants did not illegally intercept any cable programing delivered through a cable network in violation of 47 U.S.C. § 553, nor did Defendants illegally intercept any cable programing delivered by satellite or radio in violation of 47 U.S.C. § 605. The evidence clearly and conclusively shows Defendant's restaurant ("Greenville Avenue Pizza") was a commercial customer of Time Warner Cable – a cable operator under the statute – and Time Warner Cable specifically authorized the receipt and broadcast of cable programming at issue, which programming was delivered via cable network. As Greenville Avenue Pizza's receipt and display of cable programming was expressly and specifically authorized by a cable operator, there was no violation of 47 U.S.C. § 553. Similarly, the undisputed evidence establishes there was no interception of cable programming delivered by satellite or radio. Without any satellite or radio

[1]*Cablevision of Michigan, Inc. v. Sports Palace, Inc.*, 27 F.3d 566 (6th Cir. 1994) (citing H.R.Rep. No. 934, 98th Cong., 2d Sess. 83 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, 4720). Plaintiff also referenced this quote at Page 13 of its Motion for Summary Judgment.

[2]*Id.* (47 U.S.C. § 553 applies to theft of cable service offered over a cable system, while 47 U.S.C. § 605 provides a strengthened statutory basis to deter piracy of satellite and radio transmissions of cable programming).

[3]See Plaintiff's Original Complaint.

[4]Deposition of Thomas Riley, P24, L1-3; and P25, L13-17).

transmission of cable programming, there can be no violation of 47 U.S.C. § 605.

J&J Sports also lacks standing to pursue the claims asserted because it owns no legal interest in any cable programming delivered by Time Warner Cable to Greenville Avenue Pizza. The undisputed evidence shows J&J Sports claims an exclusive right to a "closed circuit broadcast". But the contract on which J&J Sports relies expressly limits J&J Sports' rights and that contract also excludes the cable programming at issue from its definition of "closed circuit broadcast". J&J Sports is also barred by collateral estoppel from re-litigating whether an innocent commercial cable customer is liable for cable piracy when a cable operator authorizes the delivery of cable programming to the commercial customer inadvertently. Finally, Greenville Avenue Pizza shows the claims by J&J Sports should be barred by the applicable two year statute of limitations.

### Statement of Undisputed Facts

Greenville Avenue Pizza entered into a Commercial Services Agreement for cable television services on or about September 20, 2007 with Time Warner Cable. (**Mandell Affidavit, ¶4**) Time Warner Cable is a provider of cable television services. (**Time Warner Cable Affidavit by Vince Margiotta, ¶3**)[5] Greenville Avenue Pizza was a commercial customer of Time Warner Cable from September 20, 2007 until after December 31, 2007 and was never anything other than a commercial customer of Time Warner Cable. (**Mandell Affidavit, ¶5-¶6; Margiotta Affidavit, ¶5**)

Greenville Avenue Pizza received cable television service from Time Warner Cable during the month of December, 2007. (**Mandell Affidavit, ¶7; Margiotta Affidavit, ¶6**) Time Warner Cable was the only provider of television service to Greenville Avenue Pizza in December, 2007;

---

[5]Further references to the Time Warner Cable Affidavit by Vince Margiotta will be made as "Margiotta Affidavit".

the restaurant had no public broadcast television service; the restaurant had no satellite television service; and the restaurant's only television service was received through a cable network from Time Warner Cable. (**Mandell Affidavit, ¶8 – §11**)

On December 8, 2007, an employee of Greenville Avenue Pizza, Christopher Cook, called Samuel J. Mandell, III ("Mandell") to ask if he could purchase a pay-per-view broadcast of a boxing match between Floyd Mayweather, Jr. and Ricky Hatton, as well as other boxing matches ("the Mayweather-Hatton fight"). (**Mandell Affidavit, ¶12**) And Greenville Avenue Pizza did purchase the cable broadcast of the Mayweather-Hatton fight and other boxing matches, which were broadcast starting at 7:30 p.m. on December 8, 2007. (**Margiotta Affidavit, ¶8**)

The cost of the December 8, 2007 pay-per-view cable broadcast was $54.95. (**Mandell Affidavit, ¶13**) Time Warner Cable did not say $54.95 was the charge for residential accounts. (**Mandell Affidavit, ¶14**) Given the $54.95 price, Mandell authorized the purchase of the the Mayweather-Hatton fight from the cable operator. (**Mandell Affidavit, ¶15**) If Mandell had known J&J Sports claimed the cost of showing the boxing match at Greenville Avenue Pizza was $2,000.00, Mandell would not have authorized the purchase from Time Warner Cable. (**Mandell Affidavit, ¶16**) If Mandell had known J&J Sports claimed Time Warner Cable was not authorized to sell the Mayweather-Hatton fight to Greenville Avenue Pizza, Mandell would not have authorized the purchase from Time Warner Cable. (**Mandell Affidavit, ¶17**)

If Time Warner Cable had told Greenville Avenue Pizza that it was not authorized to sell the Mayweather-Hatton fight to commercial customers, Greenville Avenue Pizza would not have purchased the pay-per-view cable broadcast. (**Mandell Affidavit, ¶18**); and if Time Warner Cable had told Greenville Avenue Pizza it was only authorized to sell the the Mayweather-Hatton fight to

residential customers, Greenville Avenue Pizza would not have purchased the cable broadcast from Time Warner Cable. (**Mandell Affidavit, ¶19**) Because the price quoted by Time Warner Cable was only $54.95, Greenville Avenue Pizza purchased the Mayweather-Hatton fight and other boxing matches. (**Mandell Affidavit, ¶20**)

Greenville Avenue Pizza was billed $54.95 on December 16, 2007 by Time Warner Cable for the Mayweather-Hatton fight as shown by the Time Warner Cable bill. (**Mandell Affidavit, ¶21-22; Margiotta Affidavit, ¶9**) Greenville Avenue Pizza paid Time Warner Cable $54.95 for the cable television broadcast of the Mayweather-Hatton fight. (**Mandell Affidavit, ¶23; Margiotta Affidavit, ¶10**) And Greenville Avenue Pizza was authorized by Time Warner Cable to receive the cable television broadcast of the Mayweather-Hatton fight on December 8, 2007. (**Mandell Affidavit, ¶26; Margiotta Affidavit, ¶11**)

Greenville Avenue Pizza received the Mayweather-Hatton fight from Time Warner Cable by cable communication through a cable line. (**Mandell Affidavit, ¶25; Margiotta Affidavit, ¶15**) Greenville Avenue Pizza did not receive the fight by satellite or radio communication. (**Mandell Affidavit, ¶26; Margiotta Affidavit, ¶16**) The delivery by Time Warner Cable of the Mayweather-Hatton fight broadcast on December 8, 2007 to Greenville Avenue Pizza was inadvertent. (**Margiotta Affidavit, ¶12**) But Greenville Avenue Pizza did not illegally receive, intercept, steal or pirate the broadcast of the Mayweather-Hatton fight on December 8, 2007. (**Mandell Affidavit, ¶27**) Greenville Avenue Pizza did not obtain the Mayweather-Hatton fight through the use of any equipment, "black box" or other device to intercept, steal or pirate cable programming. (**Mandell Affidavit, ¶28**) Greenville Avenue Pizza has never owned, possessed or used any equipment, "black box" or other device to intercept, steal or pirate any cable programming. (**Mandell Affidavit, ¶29**)

Greenville Avenue Pizza did not at any time advertise the Mayweather-Hatton fight (**Mandell Affidavit, ¶30**); nor did they charge any cover charge or fee to enter Greenville Avenue Pizza, nor to view the broadcast of the Mayweather-Hatton fight (**Mandell Affidavit, ¶31**); Greenville Avenue Pizza did not receive any financial benefit from any patron, nor from anyone else, due to the broadcast of the Mayweather-Hatton fight. (**Mandell Affidavit, ¶32**); and Greenville Avenue Pizza did not have a liquor license on December 8, 2007. (**Mandell Affidavit, ¶33**)

### Defendants' Objections to Plaintiff's Evidence

Defendants object to the Affidavit of Thomas P. Riley because it is not based on personal knowledge as required by FED. R. CIV. P. 56(c)(4) and FED. R. EVID 602.  Instead, Riley's affidavit is mostly conclusory statements, speculation and impermissible legal conclusions that are not competent summary judgment evidence.  More particularly, Defendants object to the following:

   a.   **"In Texas, the Event was legally available to commercial establishments only through an agreement with Plaintiff." (Riley Affidavit ¶6).**

Defendants object to this legal conclusion; to Riley's lack of personal knowledge of any agreements entered into by Golden Boy Promotions, Inc.; to Riley's improper legal conclusion regarding what broadcasts were legally available in Texas to commercial establishments that is sheer speculation.

   b.   **"Defendants ... showed the Event for commercial purposes at the Establishment. (Riley Affidavit ¶10)."**

Defendants object to this conclusory statement; to Riley's lack of personal knowledge as to why Defendants broadcast the boxing match on December 8, 2007; and to this sheer speculation.

   c.   **"Plaintiff did not notify the cable or satellite provider providing service to the Establishment to unscramble the reception of the Event for the Establishment." (Riley Affidavit ¶11).**

Defendants object to this conclusory statement because Riley fails to show personal knowledge of

any scrambling of any signal received by Defendants; to the implicit speculation and assumption that

any signal was scrambled; to Riley's lack of personal knowledge of whether Defendants received

the boxing match on December 8, 2007 from a cable or satellite provider and to the impermissible

and incorrect speculation and assumption that the broadcast was received from a satellite provider.

      d.    **"In order for an unauthorized commercial establishment to receive a broadcast such as the Event, there must be some wrongful action, such as an unauthorized decoder or satellite access card ... ." (Riley Affidavit ¶12).**

Defendants object to these conclusory statements because Riley fails to show personal knowledge

of any Defendants' conduct that was illegal or wrongful. This part of the Affidavit is impermissible

speculation and conclusory statements on an ultimate issue without any evidentiary support.

      e.    **"Defendants could not have obtained the transmission of the Event had Defendants not undertaken specific wrongful actions, to intercept, receive and/ or exhibit the telecast of the Event." (Riley Affidavit ¶12).**

Defendants object to these conclusory statements as Riley fails to show personal knowledge of any

Defendants' conduct that was illegal or wrongful. This part of the Affidavit is just impermissible

speculation and conclusory statements on an ultimate issue without any evidentiary support.

      f.    **"Defendants' patrons purchased food and/or drinks while viewing the Event. But for Defendants pirating the Event, its patrons would have had to view the Event at a commercial establishment authorized by Plaintiff to receive and exhibit the transmission." (Riley Affidavit ¶13).**

Defendants object to these conclusory statements because Riley fails to show personal knowledge

of any conduct of Defendants' patrons and the statement is speculation; the statement on "pirating"

is also speculation and a legal conclusion on an ultimate issue without any evidentiary support.

      g.    **"As a result of the theft by Defendants and others ..." (Riley Affidavit ¶14).**

Defendants object to all of the conclusory statements in paragraph 14 because Riley fails to

demonstrate personal knowledge of any business or revenue allegedly lost and paragraph 14 is sheer

speculation.  Riley is not qualified under FED. R. CIV. P. 702 as an expert on lost revenue; Riley was

not identified as an expert; and Riley fails to show his conclusions are based on a competent,

generally accepted methodology.  Statements on any alleged "theft by Defendants" are also sheer

speculation and a legal conclusion on an ultimate issue without evidentiary support.

      h.      **"Defendants' actions have eroded the base of Plaintiff's customers ..." (Riley Affidavit ¶15).**

Defendants object to the conclusory statements in paragraph 15 because Riley fails to demonstrate

personal knowledge of any customers allegedly lost and paragraph 15 is sheer speculation.  Riley

also fails to show he is qualified under FED. R. CIV. P. 702 to provide expert testimony on customers

lost; Riley was not identified as an expert witness on lost customers; and Riley fails to show his

conclusions are supported by a competent, generally accepted methodology to calculate lost

customers.  The statements about any alleged "unauthorized broadcast" are also sheer speculation

and a legal conclusion on an ultimate issue without evidentiary support.

      i.      **"Plaintiff has suffered damage to their (sic) goodwill and reputation ..." (Riley Affidavit ¶16).**

Defendants object to conclusory statements in paragraph 16 as Riley fails to show personal

knowledge of any alleged damage to goodwill or reputation and paragraph 16 is sheer speculation.

Riley is not qualified under FED. R. CIV. P. 702 as an expert on damage to goodwill or reputation;

Riley was not identified as an expert; and Riley fails to show his conclusions are based on a

competent, generally accepted methodology.

      j.      **"The continued viability of Plaintiff as a business concern depends upon ..." (Riley Affidavit ¶17).**

Defendants object to the conclusory statements in paragraph 17 as Riley fails to demonstrate any

personal knowledge of potential damage to Plaintiff's viability as a business and paragraph 17 is

sheer speculation.  Riley is not qualified under Fed. R. Civ. P. 702 as an expert on alleged potential

damage to Plaintiff's viability as a business; Riley was not identified as an expert; and Riley fails

to show his conclusions are based on a competent, generally accepted methodology.

> **k.**      **"Defendants' only purpose and intent in exhibiting the Event was to secure a private financial gain ..." (Riley Affidavit ¶18).**

Defendants object to the conclusory statements in paragraph 18 as Riley lacks personal knowledge

of Defendants' alleged "purpose and intent" and paragraph 18 is speculation.  Riley is not qualified

under Fed. R. Civ. P. 702 as an expert on Defendants' alleged "purpose and intent"; Riley was not

identified as an expert; and Riley fails to show his conclusions are based on a competent, generally

accepted methodology.   The statements about alleged infringement or misappropriation by

Defendants are also speculation and a legal conclusion on an ultimate issue without any evidentce.

> **l.**      **"As a willful violator of the Communications Act, Defendants must be held accountable ..." (Riley Affidavit ¶19).**

Defendants object to conclusory statements in paragraph 19 as Riley lacks personal knowledge of

Defendants' conduct and he merely speculates.  Riley is not qualified under Fed. R. Civ. P. 702 as

an expert on value of license fees; he was not identified as an expert; and he fails to show his

conclusions are based on a competent, generally accepted methodology.  Assumptions about alleged

willful violations are speculation and a legal conclusion on an ultimate issue without any evidence.

### Argument and Authorities

### Plaintiff's Claims of Alleged Cable Piracy

Plaintiff is not entitled to summary judgment on claims of cable piracy.  Summary judgment

under Fed. R. Civ. P. 56 is only appropriate when there are no issues of material fact.  Plaintiff fails

to show entitlement to judgment because it does not show any unauthorized interception of cable programming in violation of 47 U.S.C. 553 and it fails to show any satellite or radio transmission at all, let alone a violation of 47 U.S.C. 605.  J&J Sports seeks judgment on both claims: 1) for alleged piracy of cable broadcasts delivered through a cable network under 47 U.S.C. § 553; and 2) for alleged piracy of cable broadcasts delivered by satellite or radio under  47 U.S.C. § 605.  But the Defendant restaurant was specifically authorized by Time Warner Cable to receive and broadcast the cable programming.  And the undisputed evidence shows no radio or satellite transmission of cable programming is at issue and no interception of any such programming.

## Claims Under 47 U.S.C. § 553

47 U.S.C. § 553(a) states the following:

(a) Unauthorized interception or receipt or assistance in intercepting or receiving service; "assist in intercepting or receiving" defined:

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, **unless specifically authorized to do so by a cable operator** or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1). (emphasis added).

Courts across the country, and in the Northern District of Texas, have held "Section 605(a) may be read as outlawing satellite signal piracy, while Section 553 bans only the theft of programming directly from a cable system."[6]  The plain language makes clear 47 U.S.C. § 553 prohibits only the

---

[6]*Cablevision of Michigan, Inc.*, 27 F.3d 566 (6th Cir. 1994); *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196 (3rd Cir. 2001) ("§ 605 encompasses interception of satellite transmissions 'to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system,' and no more. ... Once a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605); *U.S. v. Norris*, 88 F.3d 462 (7th Cir. 1995)  ("only plausible, consistent interpretation ... is

"unauthorized **interception or receipt or assistance in intercepting or receiving [cable] service**"[7] Section 553 does not impact broadcast, display, transmission or re-transmission of cable programming.[8]  It is different from – and less expansive than – 47 U.S.C. § 605, which prohibits persons from "receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio".[9]  Section 605 also prohibits persons from "divulg[ing] or publish[ing] the existence, contents, substance, purport, effect, or meaning [of a radio or satellite transmission] ... except through authorized channels of transmission or reception".[10]

Contrary to many cases cited by Plaintiffs, Section 553 does not identify the lack of authorization from a plaintiff, or from an aggrieved party, as a basis for liability.[11]  47 U.S.C. § 553(a) only permits imposition of liability when receipt of cable programming is not "specifically authorized ... by a cable operator or [as otherwise] specifically authorized by law."[12]  That this distinction is missed or not addressed in many cases is not surprising.  Plaintiff argues 47 U.S.C. §

---

that Congress intended for § 605 to apply to unlawful interception of cable programming transmitted through the air, while it intended for § 553 to apply to the unlawful interception of cable programming while it is actually being transmitted over a cable system."); *J & J Sports Productions v. Schmalz*, Civil Action C-1-09-305 (S.D. Ohio 2010) (47 U.S.C. § 605 does not apply to cable programming broadcast over a cable network); and *Joe Hand Promotions, Inc. v. Moctezuma Club, Inc.*, Civil Action 3:11-CV-00809-L (N.D. Tex. 2012) ("Section 553 addresses receipt of a broadcast via cable, and section 605 addresses receipt of satellite signals.").

[7]47 U.S.C. § 553(a) (emphasis added).

[8]Id.

[9]47 U.S.C. § 605.

[10]47 U.S.C. § 605.

[11]See 47 U.S.C. § 553(a).

[12]Id.

553 and 47 U.S.C. § 605 are strict liability statutes.[13]  And in the cited cases, courts rarely examined

the actual elements of either statute and often failed to decide which statute was allegedly violated.[14]

Many of these cases involve default judgments, summary judgments where no response is filed,

cases with defendants not represented by counsel or where defendants misrepresent commercial

businesses as residential cable customers.[15]  Even in the Texas cases cited by Plaintiff, the courts

often regurgitated language from prior decisions without apparently considering the plain language

of the statutes involved.

The undisputed evidence shows Greenville Avenue Pizza did not illegally intercept any cable

programing from a cable network in violation of 47 U.S.C. § 553 because Time Warner Cable, a

cable operator, specifically authorized receipt of the cable programming.[16]  Contrary to Plaintiff's

arguments and all of the cases that so hold, nothing in the statute is a requirement that an "exclusive

---

[13]See *J&J Sports Productions, Inc. v. Q Café, Inc.*, 2012 U.S. Dist. Lexis 8700 (N.D. Tex. 2012); *Joe Hand Promotions, Inc. v. Lee*, 2012 U.S. Dist. Lexis 73094 (S.D. Tex. 2012); *Joe Hand Promotions, Inc. v. Macias*, 2012 U.S. Dist. Lexis 36413 (S.D. Tex. 2012); *Don King Productions/KingVision v. Lovato*, 1996 U.S. Dist. Lexis 17632 (N.D. Cal. 1996); *KingVision Pay-Per-View, Ltd. v. Lake Alice Bar*, 168 F.3d 347 (9th Cir. 1999); *That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 995 (D. Md. 1993); *Garden City Boxing Club, Inc. v. Vinson*, 2003 U.S. Dist. Lexis 26180 (N.D. Tex. 2003); *KingVision Pay-Per-View, Ltd. v. Williams*, 1 F. Supp. 2d 1481 (S.D. Ga. 1998); *Top Rank v. Gutierrez*, 236 F. Supp. 2d 637 (W.D. Tex. 2001).

[14]Plaintiff's Motion for Summary Judgment, P14.

[15]See *J&J Sports Productions, Inc. v. Q Café, Inc.* ("Defendants did not file a response to Plaintiff's motion."); *Joe Hand Promotions, Inc. v. Macias*, ("Defendants ... neither filed a response in opposition to the Motion nor requested additional time"); *KingVision Pay-Per-View, Ltd. v. Lake Alice Bar*, ("Lake Alice Bar defaulted. ... Chuy's Playroom also defaulted. ... Paradise Bar never contested anything, and has never shown up in district court or here); *That's Entertainment, Inc. v. J.P.T., Inc.* ("The cable account ... was ... a residential account".); *King Vision Pay-Per-View, Ltd. v. Williams*, ("the Court ordered Williams to respond to the Motion or give notice of her intention not to respond. She responded to the Motion on February 27, 1998 and proceeds *pro se*.").

[16]Mandell Affidavit, ¶26; Margiotta Affidavit, ¶11.

broadcast licensee" must authorize the receipt of cable programming.  Presumably, if an "exclusive broadcast licensee" authorized receipt of cable programming, it would fall under the part of 47 U.S.C. § 553 that states "or as may otherwise be specifically authorized by law".  But specific authorization by a cable operator amounts to a "safe harbor" provision in 47 U.S.C. § 553.

### Specifically Authorized by Cable Operator

Greenville Avenue Pizza had a Commercial Services Agreement that authorized its receipt of cable programming from Time Warner Cable starting in September 2007.[17]  The restaurant continued as Time Warner Cable's commercial customer until after December 31, 2007.[18]  During December 2007, Greenville Avenue Pizza received cable television service from Time Warner Cable and had no other television service.[19]  On December 8, 2007, Samuel J. Mandell, III authorized an employee of Greenville Avenue Pizza to purchase the cable broadcast of the Mayweather-Hatton fight.[20]  Time Warner Cable charged $54.95.[21]  But Time Warner Cable did not disclose that price was for residential accounts.[22]  Greenville Avenue Pizza purchased the pay-per-view fight from Time Warner Cable[23]; paid Time Warner Cable $54.95 for the fight[24]; and Time Warner Cable specifically authorized Greenville Avenue Pizza to receive the cable broadcast of the fight.[25]  This specific

---

[17]Mandell Affidavit, ¶4; also, Exhibits to Margiotta Affidavit.

[18]Mandell Affidavit, ¶5; Margiotta Affidavit, ¶5.

[19]Mandell Affidavit, ¶8.

[20]Mandell Affidavit, ¶12.

[21]Mandell Affidavit, ¶13; also, Exhibits to Margiotta Affidavit.

[22]Mandell Affidavit, ¶14.

[23]Mandell Affidavit, ¶15; Margiotta Affidavit, ¶8.

[24]Mandell Affidavit, ¶23; Margiotta Affidavit, ¶10.

[25]Mandell Affidavit, ¶26; Margiotta Affidavit, ¶11.

authorization from a cable operator is all that is required to avoid liability for a supposed violation of 47 U.S.C. § 553.  Such authorization – "by a cable operator" – is the only authorization expressly identified in the statute as a means to avoid liability under 47 U.S.C. § 553.[26]

While Plaintiff's motion for summary judgment cites to various cases that it argues allow even an innocent commercial purchaser of cable programming to be held liable under Section 553, none of these cases involve an innocent commercial cable customer who was mistakenly sold cable programming at a residential rate.  But in *J & J Sports Productions v. Schmalz*, the court held that a commercial cable customer's authorized receipt of programming from the cable company does not violate  47 U.S.C. § 553.[27]  In *Schmalz*, the Court recognized that whether or not the cable operator – in *Schmalz* the cable operator was also Time Warner Cable – was authorized by the content owner to transmit the programming is not a relevant issue under 47 U.S.C. § 553.[28]  "Nowhere in this language [of Section 553] is the term 'cable operator' qualified by language indicating that the cable operator must be an 'authorized' cable operator."[29]

The significant issue under 47 U.S.C. § 553 is whether Greenville Avenue Pizza violated the law by "intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."[30]  Section 553 does not require those receiving cable programming to obtain authorization

---

[26]See 47 U.S.C. § 553.

[27]Civil Action C-1-09-305 (S.D. Ohio 2010).

[28]*Id.*

[29]*Id.*

[30]47 U.S.C. § 553.

from the content owner to avoid liability.[31]   Nor does the statute require the purchase of a commercial license from a supposed "exclusive broadcast licensee".[32]  Instead, the plain language of 47 U.S.C. § 553 statute prohibits "intercepting or receiving any communications service offered over a cable system, **unless  specifically authorized to do so by a cable operator**".[33]

The undisputed evidence shows Greenville Avenue Pizza was specifically authorized by a cable operator, Time Warner Cable, to receive the Mayweather-Hatton fight on its commercial cable account.  The plain language of the act makes clear recipients of cable programming do not violate 47 U.S.C. § 553 when they are specifically authorized to receive programming by a cable operator.  Accordingly, Defendants ask the Court to apply the statute as written, to give effect to the plain meaning of the words used; find there was no piracy of cable services, nor any violation of 47 U.S.C. § 553; and deny Plaintiff's motion for summary judgment.

**Plaintiff's Claims Under 47 U.S.C. § 605**

47 U.S.C. § 605(a) states the following:

**(a)  Practices prohibited**

Except as authorized by chapter 119, title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception,

(1) to any person other than the addressee, his agent, or attorney,

(2) to a person employed or authorized to forward such communication to its destination,

(3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed,

---

[31]*J & J Sports Productions v. Schmalz*, Civil Action C-1-09-305 (S.D. Ohio 2010).

[32]See Plaintiff's Original Complaint.

[33]47 U.S.C. § 553 (emphasis added).

(4) to the master of a ship under whom he is serving,

(5) in response to a subpoena issued by a court of competent jurisdiction, or

(6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

As noted above, 47 U.S.C. § 605 applies to "...interception of satellite transmissions 'to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system,' and no more. ... Once a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605"[34] To obtain summary judgment on its claim under Section 605, Plaintiff must establish as a matter of law that Defendants illegally "receiv[ed], assist[ed] in receiving, transmitt[ed], or assist[ed] in transmitting, any interstate or foreign communication by wire or radio" or that Defendants illegally "divulge[d] or publish[ed] the existence, contents, substance, purport, effect, or meaning [of an] interstate or foreign communication by wire or radio".[35]  Because no transmission of cable programming by satellite or radio occurred in this case, Plaintiff's Section 605 claim must fail as a matter of law.

The undisputed evidence shows Defendants did not intercept cable programing delivered by

---

[34]*Cablevision of Michigan, Inc. v. Sports Palace, Inc.*, 27 F.3d 566 (6th Cir. 1994).

[35]47 U.S.C. § 605.

radio or satellite in violation of 47 U.S.C. § 605.  This is clearly and conclusively established because the cable programming at issue was lawfully delivered through a cable network[36]; because the restaurant had no satellite television service on December 8, 2007[37]; because the restaurant did not receive the Mayweather-Hatton fight by satellite or radio communication[38]; because the restaurant did not receive the broadcast of the fight by use of any equipment, "black box" or other device to intercept, steal or pirate cable programming by satellite or radio[39]; because the restaurant never owned, possessed or used any equipment, "black box" or other device to intercept, steal or pirate any cable programming by satellite or radio[40]; and because Plaintiff has failed to even show there was any satellite or radio transmission of cable programming to Greenville Avenue Pizza at any time relevant to this case.  Thus, 47 U.S.C. § 605 does not apply.

### Strict Liability Statutes

Plaintiff claims "the Communications Act is a strict liability statute.  To establish liability, all Plaintiff must show is the Event was shown in Defendants' establishment and that such exhibition was not authorized by Plaintiff."[41]  Both 47 U.S.C. § 553 and 47 U.S.C. § 605 have been called "strict liability statutes".  But as noted in *J & J Sports Productions v. Schmalz*, to impose liability – even under strict liability – a court must first find that one of the statutes was violated.[42]  And

---

[36]Mandell Affidavit, ¶25; Margiotta Affidavit, ¶15.

[37]Mandell Affidavit, ¶10.

[38]Mandell Affidavit, ¶26; Margiotta Affidavit, ¶16.

[39]Mandell Affidavit, ¶28.

[40]Mandell Affidavit, ¶29

[41]Plaintiff's Motion for Summary Judgment, P14.

[42]Civil Action C-1-09-305 (S.D. Ohio 2010).

Defendants did not violate either section of the Communications Act.  There was no violation of

Section 553 because Time Warner Cable expressly authorized reception of the programming.  There

also was no violation of Section 605 as there was no transmission or communication by wire or

satellite.  Thus, Plaintiff fails to establish essential elements on both claims, Plaintiff is not entitled

to judgment and Defendants asks the Court to deny Plaintiff's Motion for Summary Judgment.

### Plaintiff Lacks Standing to Pursue its Claims

The summary judgment evidence also shows Plaintiff lacks standing to pursue its claims in

this lawsuit because it has no legal interest in cable programming delivered by Time Warner Cable

to Greenville Avenue Pizza.  The undisputed evidence shows the contract upon which J&J Sports

relies to claim an exclusive right to a "closed circuit broadcast" expressly limits J&J Sports' rights.

That contract also contains a "Closed Circuit Television Standard Terms & Conditions" – found at

pages 23 to 35 of Plaintiff's Appendix – and includes the following terms:

**"Golden Boy Promotions, Inc. (hereinafter referred to as 'Promoter'"**[43]

**"J & J Sports Productions, Inc. ('Licensee' or 'Sublicensor')"**[44]

**a.       The right and license herein granted is solely for the live exhibition simultaneously with the Event, in its entirety, solely on a closed circuit basis, as provided in the Television License Agreement and the Closed Circuit Television Sublicense Agreement to which these standard terms and conditions are annexed"**[45]

**"b.       The term 'closed circuit basis' shall mean exhibition of the Event at places of public assembly where an admission fee or other consideration is charged or received"**[46]

---

[43]Closed Circuit Television Standard Terms & Conditions, Plaintiff's Appendix, P23.

[44]Id.

[45]Id.

[46]Id.

**"12.    Reserved Rights.**

**a.    All rights of any kind whatsoever in the Event and the Telecast other than the rights specifically granted herein ... are hereby expressly reserved by Promoter ..."**[47]

**"19.    Effectiveness.**

**The terms and conditions set forth herein constitute the full agreement and complete understanding between the parties with respect to the subject matter and supersedes any and all prior understandings, whether written or oral, pertaining to the subject matter hereof and cannot be modified except by written instrument signed by all parties hereto."**[48]

Plaintiff's representative Thomas P. Riley admitted the Standard Terms and Conditions were part of J&J Sports' agreement with Golden Boy Promotions, Inc.[49]  Riley also said "closed circuit basis" means the "exhibition of the Event at places of public assembly where an admission fee or other consideration is charged or received" as noted in the agreement.[50]  But what J&J Sports calls its "exclusive license" is only a limited license for closed circuit exhibitions – "where an admission fee is charged or received".[51]  It is undisputed Defendants did not charge any cover charge or fee to enter Greenville Avenue Pizza, nor to view the broadcast of the Mayweather-Hatton fight.[52]  It is also undisputed Defendants received no financial benefit from any patron, nor from anyone else, as a result of the December 8, 2007.[53]  As the restaurant charged no admission or cover charge to view

---

[47]Id. at P32.

[48]Id. at P34.

[49]Riley Deposition, P128, L4-17.

[50]Id. at P129, L6-13.

[51]Id. at P103, L14-L22; see also Closed Circuit Television Standard Terms & Conditions, Plaintiff's Appendix, P23. (emphasis added)

[52]Mandell Affidavit, ¶31; Connelly Affidavit, P1 – Plaintiff's Appendix, P37.

[53]Mandell Affidavit, ¶32; Connelly Affidavit, P1 – Plaintiff's Appendix, P37.

the broadcast, the Plaintiff's alleged "exclusive license" clearly excludes the December 8, 2007 broadcast at Greenville Avenue Pizza from its definition of exhibitions on a "closed circuit basis".[54]

Plaintiff and Golden Boy Promotions, Inc. also agreed the "terms and conditions [in the license] constitute the full agreement and complete understanding between the parties ... and [the license] cannot be modified except by written instrument signed by all parties hereto."[55]   Riley testified at deposition that the agreement with Golden Boy Promotions, Inc. could be modified without any writings.[56]  But Plaintiff presents no evidence to support this claim.  The only competent evidence of Plaintiff's alleged rights to the Mayweather-Hatton fight is the Closed Circuit Television Standard Terms & Conditions in Plaintiff's Appendix.  And those "limited" rights do not confer any standing to pursue claims over cable programming that was not an exhibition on a "closed circuit basis".  Accordingly, Defendants request the Court deny Plaintiff's Motion for Summary Judgment.

### Plaintiff's Claims are Barred by Collateral Estoppel

J&J Sports is barred by collateral estoppel from re-litigating whether an innocent commercial cable customer is liable for cable piracy when a cable operator specifically authorizes the commercial customer to receive the programming.  This issue was decided against J&J Sports in *J&J Sports Productions v. Schmalz*.[57]  J&J Sports and Time Warner Cable were both parties in *Schmalz*.[58]

Three prerequisites are necessary for collateral estoppel under federal law: (1) the issue at stake must be identical to the one involved in prior litigation; (2) the issue must have been actually

---

[54]Closed Circuit Television Standard Terms & Conditions, Plaintiff's Appendix, P23.

[55]Id. at P34.

[56]Riley Deposition, P

[57]Civil Action C-1-09-305 (S.D. Ohio 2010).

[58]*Id.*

litigated in the prior litigation; and (3) the determination of the issue in prior litigation must have been a critical and necessary part of the earlier judgment.[59]  Complete identity of parties in the two lawsuits is not required.[60]  "The federal principle of collateral estoppel precludes re-litigation of an adversely decided issue by a party who has once had a full and fair opportunity to litigate the issue, regardless of whether his present adversary was a party to the previous lawsuit."[61]

Collateral estoppel is a bar here to efforts by J&J Sports to re-litigate the issues of whether an innocent commercial cable customer is liable for cable piracy, under 47 U.S.C. § 553 or U.S.C. § 605, when a cable operator specifically authorizes the customer to receive cable programming through a cable network.  The evidence shows Defendants satisfy all three requirements to establish the collateral estoppel bar.  First, the issues of cable piracy in this case are identical to the issues decided in *J&J Sports Productions v. Schmalz* – the prior litigation[62]; second, all of the issues were actually litigated to a final conclusion of summary judgment in *Schmalz*[63]; and last, the decision in *Schmalz* – that an innocent commercial cable customer is not liable for cable piracy when a cable operator specifically authorized the commercial cable customer, to receive programming through a cable network – was a critical and necessary part of the judgment in *Schmalz*.[64]

In *Schmalz*, the court identified the plaintiff, J&J Sports Productions, as a commercial

---

[59]*Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir. 1981); and *Stovall v. Price Waterhouse Co.*, 652 F.2d 537, 540 (5th Cir. 1981).

[60]*Wehling v. Columbia Broadcasting System*,721 F.2d 506 (5th Cir. 1983).

[61]*Id.* (citing *Willis v. Fournier*, 418 F.Supp. 265, 266 (M.D.Ga.), aff'd, 537 F.2d 1142 (5th Cir. 1976); and *Allen v. McCurry*, 449 U.S. 90, 94-95, 101 S.Ct. 411, 414-415 (1980)).

[62]Civil Action C-1-09-305 (S.D. Ohio 2010).

[63]Id.

[64]Id.

distributor of sporting events – as in this case; the event in *Schmalz* was a boxing match promoted by Golden Boy Promotions, Inc. – as in this case; the defendants in *Schmalz* were a commercial establishment and its owner – as in this case; the cable operator in *Schmalz* was Time Warner Cable – as in this case; the defendant establishment had always held a commercial cable account with Time Warner Cable – as in this case; in *Schmalz*, an employee of the defendant establishment called Time Warner Cable to ask for the price of the pay-per-view fight – as in this case; the price to broadcast the fight to one television was $54.95 in *Schmalz* – as in this case; it was undisputed in *Schmalz* that the defendants never possessed or used any "black box" or other device to steal or intercept cable service – as in this case; the defendant establishment received the pay-per-view fight in *Schmalz* by cable network and not by satellite or radio – as in this case;  the defendant establishment was billed $54.95 for the pay-per-view fight in *Schmalz* – as in this case; the defendant establishment paid the $54.95 bill for fight in *Schmalz* – as in this case; Time Warner Cable obtained its rights the pay-per-view fight in *Schmalz* from iN Demand L.L.C. and HBO Pay-Per-View – as in this case; Time Warner Cable's agreements with iN Demand L.L.C. and HBO Pay-Per-View in *Schmalz* provided an exclusive remedy for any inadvertent sale of the pay-per-view fight to a commercial cable customer – as in this case; Time Warner Cable inadvertently sold the fight to a commercial cable customer in *Schmalz* – as in this case;  Time Warner Cable paid J&J Sports the commercial license rate amount for the fight due to the inadvertent sale to a commercial cable customer in *Schmalz* – while in this case Time Warner Cable has offered such payment; and in *Schmalz*, the trial court found as a matter of law that there was no violation of either 47 U.S.C. § 553 or 47 U.S.C § 605 under an identical set of facts as the undisputed facts presented in that case.

As the court in *J&J Sports Productions v. Schmalz* previously decided all issues alleged by

the plaintiff of supposed violations of  47 U.S.C. § 553 and 47 U.S.C § 605 by an innocent

commercial cable customer against J&J Sports; as the issues at stake here are identical to the issues

involved in *Schmalz* – the prior litigation; as all issues were actually litigated to final conclusion of

summary judgment in *Schmalz*[65]; and finally, as the issues decided in *Schmalz* were a critical and

necessary part of the judgment in *Schmalz*, Greenville Avenue Pizza respectfully requests this Court

find that collateral estoppel bars the Plaintiff's efforts to re-litigate these issues in this case.

### Plaintiff's Claims are Barred by Limitations

Defendants shows the claims by J&J Sports are barred by the two year statute of limitations

in TEX. CIV. PRAC. & REM. CODE § 16.003.  In *J&J Sports Productions, Inc. v. JWJ Management,*

*Inc.*, the Fort Worth Court of Appeals held that claims under 47 U.S.C. § 553 and 47 U.S.C. § 605

in Texas are governed by a two year statute of limitations.[66]  This conclusion from the Fort Worth

Court of Appeals is different from the Fifth Circuit's decision in *Prostar v. Massachi*, which applied

a three year limitations period in a Louisiana case for claims under 47 U.S.C. § 553 and 47 U.S.C.

§ 605.[67]  Nonetheless, Defendants submits the analysis of Texas law by the Fort Worth Court of

Appeals should be applied here, rather than the analysis from Louisiana law in the *Prostar* decision.

In *JWJ Management*, the Fort Worth Court of Appeals applied the Texas two-year limitations

period from TEX. CIV. PRAC. & REM CODE § 16.003 to claims under 47 U.S.C. § 553 and 47 U.S.C.

§ 605.[68]  The *JWJ Management* decision says for federal statutes enacted before 1990 that do not

specifically provide an applicable limitations period, "the general rule is to 'borrow' the most closely

---

[65]Id.

[66]324 S.W.3d 823 (Tex.App.–Fort Worth, no pet.)

[67]239 F.3d 669, 677-78 (5th Cir. 2001).

[68]324 S.W.3d at 824.

analogous state limitations period."[69] The decision also recognizes precedent from the U.S. Supreme

Court in *Agency Holding Corp. v. Malley-Duff & Associates,* that "'generally ... Congress intended

that the courts apply the most closely analogous statute of limitations under state law."[70] The "mere

fact that state law fails to provide a perfect analogy to the federal cause of action is never itself

sufficient to justify the use of a federal statute of limitations."[71]

The Fort Worth Court of Appeals also noted the Third and Ninth Circuits reach a different

conclusion than the Fifth Circuit in *Prostar.*[72] In *Kingvision Pay-Per-View, Corp. v. 898 Belmont,

Inc.,* the Third Circuit said Pennsylvania "has a cable piracy statute similar to the federal statute [and

the Pennsylvania] statute has a two-year statute of limitations.[73] In *DirecTV, Inc. v. Webb,* the Ninth

Circuit determined the statute of limitations for a violation of 47 U.S.C. § 605 by applying state

law.[74] With all of this analysis, the Fort Worth Court of Appeals agreed with the Third and Ninth

Circuits and found the "Copyright Act does not truly afford a closer fit to the federal cable piracy

statute than the Texas cable piracy statutory scheme."[75] Also, "borrowing Texas's two-year statute

of limitations does not frustrate either the purpose or the implementation of the FCA's cable piracy

---

[69]*Id.* (citing *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,* 545 U.S. 409, 414-15, 125 S.Ct. 2444, 2448 (2005).

[70]*Id.* (citing 483 U.S. 143, 144, 107 S.Ct. 2759, 2761 (1987)).

[71]*Id.* (citing 107 S.Ct. at 2763).

[72]*Id.*

[73]*Id.* (citing 366 F.3d 217, 219 (3rd Cir. 2004) ("no special considerations relevant to bringing FCA claims would be frustrated by a two-year limitations period."))

[74]*Id.* (citing 545 F.3d 837 (9th Cir. 2008) ("California has a piracy statute 'remarkably similar to § 605 in purpose and structure." And "'[G]eographic considerations do not counsel for the adoption of a federal limitations period *less* analogous than a state counterpart.'")).

[75]*Id.* at 31.

provisions."[76]   Accordingly, Defendants submit the proper limitations period for piracy claims in Texas is two years.   As Plaintiff filed this lawsuit nearly three years after the alleged piracy, Defendants request the Court find Plaintiffs' claims are barred by limitations.

## Conclusion

The undisputed evidence establishes as a matter of law that Defendants did not illegally intercept any cable programing delivered by cable network in violation of 47 U.S.C. § 553 and Defendants did not illegally intercept any cable programing delivered by satellite or radio in violation of 47 U.S.C. § 605.   Defendants request the Court deny Plaintiff's motion for summary judgment because Time Warner Cable – a cable operator under the statute – specifically authorized the receipt and broadcast of the cable programming at issue so there was no violation of 47 U.S.C. § 553.   The undisputed evidence also shows there was no interception of cable programming delivered by satellite or radio, thus 47 U.S.C. § 605 does not apply and there was no violation of 47 U.S.C. § 605.

The evidence conclusively shows J&J Sports lacks standing to pursue piracy claims because it owns no legal interest in cable programming delivered by Time Warner Cable to Greenville Avenue Pizza.   Defendants also show J&J Sports is barred by collateral estoppel from re-litigating whether an innocent commercial cable customer is liable for cable piracy when a cable operator authorizes the delivery of cable programming to the commercial customer inadvertently.   Finally, Defendants show the claims by J&J Sports should be barred by the applicable statute of limitations.

## Prayer

WHEREFORE, Defendants, Mandell Family Ventures, LLC and Samuel J. Mandell, III, pray that the Court deny Plaintiff's Motion for Summary Judgment in its entirety.

---

[76]*Id.*

Respectfully submitted,

*/s/ William J. Dunleavy*
William J. Dunleavy
State Bar No. 00787404
Law Offices of William J. Dunleavy, P.C.
8140 Walnut Hill Lane
One Glen Lakes, Suite 950
Dallas, Texas  75231
Telephone No. 972/247-9200
Telecopier No. 972/247-9201

ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify on July 13, 2012, I electronically filed the foregoing document with the clerk of the U.S. District Court Northern District of Texas, using the electronic case filing system of the court. The electronic filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

Mr. Andrew R. Korn
Mr. David Diaz
Korn, Bowdich & Diaz, L.L.P.
4221 Avondale Avenue
Dallas, Texas 75219

Mr.  John T. Cox III
Lynn Tillotson Pinker & Cox, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201

*/s/ William J. Dunleavy*
William J. Dunleavy